Beth E. Terrell, WSBA #26759
Blythe H. Chandler, WSBA #43387
Attorneys for Plaintiffs
TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
Telephone: (206) 816-6603
Facsimile: (206) 319-5450
Email:  bterrell@terrellmarshall.com
Email:  bchandler@terrellmarshall.com

[Additional Counsel Appear on Signature Page]

UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF WASHINGTON

RANCHERS-CATTLEMEN ACTION
LEGAL FUND UNITED
STOCKGROWERS OF AMERICA and
CATTLE PRODUCERS OF
WASHINGTON,

          Plaintiffs,

    v.

UNITED STATES DEPARTMENT OF
AGRICULTURE and SONNY
PERDUE, in his official capacity as
Secretary of Agriculture,

          Defendants.

NO. 2:17-cv-00223-RMP

**PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT**

**NOTE ON MOTION
CALENDAR:
February 20, 2018**

**ORAL ARGUMENT
REQUESTED**

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
Case No. 2:17-cv-00223-RMP

1

## **TABLE OF CONTENTS**

2

**Page**

I.    INTRODUCTION .........................................................................1

II.   BACKGROUND .........................................................................4

      A.    The FMIA requires COOL on imported meat sold at retail..............4

      B.    The FMIA's regulations fail to implement this requirement............7

      C.    The Government has repeatedly recognized USDA's FMIA
            regulations conflict with the statute ...............................10

      D.    USDA's failure to implement the FMIA harms Plaintiffs..............14

III.  STANDARD OF REVIEW ........................................................17

IV.   STANDING..............................................................................17

V.    SUMMARY OF ARGUMENT...................................................21

VI.   ARGUMENT.............................................................................22

      A.    USDA'S FMIA regulation regarding the labeling of imports
            violates Congress' clear intent and thus is unlawful.....................22

      B.    Accordingly, USDA's regulation should be vacated and
            declared unlawful, and the agency should be enjoined..................26

VII.  CONCLUSION..........................................................................29

1

# <u>TABLE OF CONTENTS</u>

2

**Page**

*Advocacy Ctr. v. Mink,*
3        322 F.3d 1101 (9th Cir. 2003) ................................................................18

4  *Apple Computer, Inc. v. Franklin Computer Corp.*,
        714 F.2d 1240 (3d Cir. 1983) ......................................................... 28, 29

5

6  *Arcia v. Fla. Sec'y of State,*
        772 F.3d 1335 (11th Cir. 2014) ..............................................................21

7  *Beef Nebraska, Inc. v. United States*,
        807 F.2d 712 (8th Cir. 1986) ..................................................................24

8

9  *Bicycle Trails Council of Marin v. Babbitt,*
        82 F.3d 1445 (9th Cir. 1996) ........................................................... 22, 23

10 *California Hosp. Ass'n v. Maxwell-Jolly,*
        No. CIV S-10-3465, 2011 WL 285866 (E.D. Cal. Jan. 28, 2011) ...........28

11

12 *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*,
        467 U.S. 837 (1984)........................................................................ 22, 23

13 *Citizens for Better Forestry v. U.S. Dep't of Agric.,*
        No. C 04-4512 PJH, 2007 WL 1970096 (N.D. Cal. July 3, 2007) ..........27

14

15 *City of Spokane v. Monsanto Co.,*
        237 F. Supp. 3d 1086 (E.D. Wash. 2017)................................................18

16 *Coho Salmon v. Pac. Lumber Co.,*
        30 F. Supp. 2d 1231 (N.D. Cal. 1998)....................................................18

17

18 *Defs. of Wildlife v. Salazar*,
        776 F. Supp. 2d 1178 (D. Mont. 2011) ...................................................26

19 *Defs. of Wildlife v. U.S. Envtl. Prot. Agency*,
        420 F.3d 946 (9th Cir. 2005) ..................................................................26

20

21

*Fair Hous. Council of San Fernando Valley v. Roommate.com, LLC,*
        666 F.3d 1216 (9th Cir.2012) ............................................................. 18, 19

*Ferrostaal Metals Corp. v. United States,*
        11 Ct. Int'l Trade 470 (1987).........................................................9

*Ganadera Indus., S.A. v. Block,*
        727 F.2d 1156 (D.C. Cir. 1984)..................................................23

*Humane Soc. of U.S. v. Locke,*
        626 F.3d 1040 (9th Cir. 2010) ...................................................26

*Hunt v. Wash. State Apple Adver. Comm'n,*
        432 U.S. 333 (1977)....................................................................18

*Long Beach Area Chamber of Commerce v. City of Long Beach,*
        603 F.3d 684 (9th Cir. 2010) .....................................................17

*Nat'l Ass'n of Home Builders v. Defs. of Wildlife,*
        551 U.S. 644 (2007).....................................................................26

*Orca Bay Seafoods v. Nw. Truck Sales, Inc.,*
        32 F.3d 433 (9th Cir. 1994) .......................................................22

*Pac. Mar. Ass'n v. Nat'l Labor Relations Bd.,*
        827 F.3d 1203 (9th Cir. 2016) ............................................. 22, 26

*Pollinator Stewardship Council v. U.S. E.P.A.,*
        806 F.3d 520 (9th Cir. 2015) .....................................................27

*S.E.C. v. Sprecher,*
        594 F.2d 317 (2d Cir. 1979) ......................................................24

*States v. Heon Seok Lee,*
        No. 12-CR-109, 2017 WL 4283407 (N.D. Ill. Sept. 27, 2017)..................8

*Uniroyal, Inc. v. United States,*
        3 Ct. Int'l Trade 220 (1982)........................................................9

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT - iii
Case No. 2:17-cv-00223-RMP

*United States v. Campbell*,
    897 F.2d 1317 (5th Cir. 1990) ....................................................27

*United States v. Dental Care Assocs. of Spokane Valley*,
    No. 2:15-CV-23-RMP,
    2016 WL 755638 (E.D. Wash. Feb. 25, 2016)................................. 27, 29

*Valle del Sol Inc. v. Whiting*,
    732 F.3d 1006 (9th Cir. 2013) ....................................................18

## FEDERAL STATUTES

5 U.S.C. § 706(2) ...................................................................22

19 U.S.C. § 1304(a) ..............................................................1, 5

21 U.S.C. § 301 .......................................................................1

21 U.S.C. § 620(a) ..................................................... *passim*

*Consolidated Appropriations Act, 2016*,
    Pub. L. No. 114-113, § 759, 129 Stat. 2242 (2016) ...................................13

*Farm Security and Rural Investment Act of 2002*,
    Pub. L. No. 107-171, § 282, 116 Stat. 134 (2002) ...................................10

## FEDERAL REGULATIONS

9 C.F.R. § 327.14(a)..............................................................29

9 C.F.R. § 327.18(a)................................................. *passim*

19 C.F.R. § 134.1(d) ........................................................ 5, 6, 8, 25

19 C.F.R. § 134.35(a).............................................................8

## OTHER AUTHORITIES

54 Fed. Reg. 41045 (Oct. 5, 1989)...........................................................8

68 Fed. Reg. 61944, 61948 (Oct. 30, 2003)........................................ 2, 10, 12, 25

81 Fed. Reg. 10755 (Mar. 2, 2016).......................................................................13

Peter Chang,
    *Country of Origin Labeling: History and Public Choice Theory,*
    64 Food & Drug L.J. 693 (2009) ................................................ 7, 8, 15, 25

Consumer Reports, *Organic Food Labels Survey* 9 (Mar. 2014).........................3

Joel L. Greene, Cong. Research Serv.,
    *Country-of-Origin Labeling for Foods and the WTO Trade Dispute
    on Meat Labeling* (Mar. 8, 2016) ........................................................ 2, 25

Alan S. Gutterman,
    *Business Transactions Solutions* § 272:42 (West 2017) .............................9

H.R. Rep. No. 90-653 (1967).......................................................................... 6, 24

Panel Report, *United States – Certain Country of Origin Labeling (COOL)
Requirements,*
    7.698, WTO Doc. WT/DS384/RW (adopted Oct. 20, 2014) ...................12

Wendy J. Umberger et al.,
    *Country of Origin Labeling of Beef Products: U.S. Consumers'
    Perceptions*, 34 J. of Food Dist. Res. 103 (2003) .......................................2

USDA, *Food Standards and Labeling Policy Book* 155-56 (Aug. 2005).............2

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

# I.  INTRODUCTION

This case concerns whether a Federal Meat Inspection Act ("FMIA")

regulation can exempt imported beef and pork from complying with the statute's

demand that meat be labeled with its country of origin through retail.  Under

uncontroversial, well-established law, the answer is no.  Accordingly, the

regulation should be declared unlawful and vacated, and the agency should be

enjoined so it can no longer act in conflict with Congress' directive.

The FMIA provides that for "meat or meat food products,"

> All such imported articles shall, upon entry into the
> United States, be deemed and treated as domestic articles
> subject to the other provisions of this chapter and the
> Federal Food, Drug, and Cosmetic Act [21 U.S.C. § 301
> et seq.]: *Provided*, That they shall be marked and labeled
> as required by such regulations for imported articles[.]

21 U.S.C. § 620(a) (emphasis and first brackets in original).

The "regulations for imported articles," with which the FMIA demands

imported meat comply, include the Tariff Act.  The Tariff Act requires that

imported articles must be "marked … to indicate to an ultimate purchaser in the

United States the English name of the country of origin of the article."  19 U.S.C.

§ 1304(a).

However, USDA's FMIA regulations allow imported meat to "be deemed

and treated as domestic products" without any requirement that domestic

distributors provide country-of-origin labels.  9 C.F.R. § 327.18(a).  In fact,

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT - 1
Case No. 2:17-cv-00223-RMP

USDA's policies allow imported meat sold by domestic processors to be labeled as "Product[s] of U.S.A." USDA, *Food Standards and Labeling Policy Book* 155-56 (Aug. 2005).[1]  USDA implements the exact opposite rule from what the FMIA requires.

Indeed, both USDA and the Congressional Research Service *agree* that the agency has failed to implement the FMIA's labeling requirements.  Mandatory Country of Origin Labeling of Beef, Lamb, Pork, Fish, Perishable Agricultural Commodities, and Peanuts, 68 Fed. Reg. 61944, 61948 (Oct. 30, 2003); Joel L. Greene, Cong. Research Serv., *Country-of-Origin Labeling for Foods and the WTO Trade Dispute on Meat Labeling*, 31 (Mar. 8, 2016) (provided to the Court as Dkt. No. 1-1).  Nonetheless, the agency refuses to correct its misconduct.

Any of the above would be sufficient to warrant this Court's intervention, but it is particularly necessary here.  The agency's failure to carry out the FMIA's labeling requirements undermines domestic ranchers' livelihoods.  Consumers will pay a premium for domestically produced meat.  *See*, *e.g.*, Wendy J. Umberger et al., *Country of Origin Labeling of Beef Products:  U.S. Consumers' Perceptions*, 34 J. of Food Dist. Res. 103, 103 (2003) (abstract summarizing that consumers are "willing to pay a 19% premium for steak labeled as 'U.S.A. Guaranteed: Born and

[1]https://www.fsis.usda.gov/OPPDE/larc/Policies/Labeling_Policy_Book_082005.pdf

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT - 2
Case No. 2:17-cv-00223-RMP

Raised in the U.S.'").[2]  However, because of USDA's rules, multinational meat packing companies can import meat and sell it in a manner to give the impression it is a domestic product.  *See* Declaration of Lorene Bonds ("Bonds Decl.") ¶ 10 (current labeling results in consumer confusion); Declaration of David Niemi ("Niemi Decl.") ¶ 10 (same); Consumer Reports, *Organic Food Labels Survey* 9 (Mar. 2014) (eighty-four percent of consumers believe store labels should either state where a product was grown or separately identify where it was grown and processed).[3]  Accordingly, the meat packers, who control nearly the entire beef market, only compensate domestic beef producers—like Plaintiffs' members— based on what they pay for foreign beef.  There is no incentive to pay a premium for beef produced under the United States' food safety, production, and labor laws. The flood of cheaper foreign meat, marketed as indistinguishable from domestic products, also drives down demand for Plaintiffs' members' direct-to-consumer sales.  Put simply, USDA's unilateral decision to retreat from country-of-origin labeling ("COOL"), in contradiction to the FMIA, aids multinational meat companies and undermines the viability of domestic ranchers.  Plainly, this is not what Congress intended and it should not be allowed to continue.

---

[2] http://ageconsearch.umn.edu/bitstream/27050/1/34030103.pdf

[3] http://greenerchoices.org/wp-content/uploads/2016/08/CR2014OrganicFoodLabelsSurvey.pdf

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT - 3
Case No. 2:17-cv-00223-RMP

## II. BACKGROUND

A full recounting of the relevant statutes, regulations, and interpretations establishes USDA is controverting Congress' directive and thus the agency should be ordered to revise its COOL rules. The FMIA unequivocally incorporates the labeling requirements of the Tariff Act, which mandates certain imported meat bear country-of-origin labels through retail. Lest there be any doubt, Congress stated this was its intent in enacting the FMIA. Yet, USDA's FMIA regulations fail to reproduce this requirement. Indeed, as part of recent rulemakings, both USDA and the Congressional Research Service have acknowledged there is a sizable gap between the labels that should be required under the FMIA and what USDA demands. Nonetheless, USDA continues to permit imported meat to be sold to consumers without the statutorily required labels, harming Plaintiffs and their members.

### A.    The FMIA requires COOL on imported meat sold at retail.

Section 620(a) of the FMIA establishes "marking and labeling" requirements for "[i]mport[ed]" meat. 21 U.S.C. § 620(a). It allows imported meat to be sold in the United States only if the products comply with the United States' food safety rules *and* carry all labels required of imports.

Specifically, § 620(a) states that imports should be treated as "domestic articles subject to the other provisions of this chapter and the Federal Food, Drug,

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT - 4
Case No. 2:17-cv-00223-RMP

1    and Cosmetic Act"—so that consumers are not exposed to adulterated products—

2    and "*Provided*, That they shall be marked and labeled as required by such

3    regulations for imported articles[.]" *Id.* § 620(a) (emphasis in original).  The

4    FMIA incorporates by reference the labeling rules for imports.

5           The Tariff Act is a statute that addresses that "[m]arking of articles" that are

6    "imported into the United States." 19 U.S.C. § 1304(a).  Thus, it supplies labeling

7    rules incorporated into the FMIA.

8           The Tariff Act states that, except as allowed under the act, items "imported

9    into the United States shall be marked … to indicate to an ultimate purchaser in the

10   United States the English name of the country of origin of the article." *Id.*

11   § 1304(a).  The exceptions concern specifically enumerated goods, which do not

12   include imported meat. *See id.* § 1304(c)-(h).

13          The Tariff Act's regulations explain that "ultimate purchaser" typically

14   means the consumer.  "Ultimate purchaser" is defined as "generally the last person

15   in the United States who will receive the article in the form in which it was

16   imported." 19 C.F.R. § 134.1(d).  Domestic importers or middlemen will only be

17   considered the "'ultimate purchaser,' if [they] subject[] the imported article to a

18   process which results in a substantial transformation of the article[.]" *Id.*

19   § 134.1(d)(1).  "If the manufacturing process is merely a minor one which leaves

20   the identity of the imported article intact, the consumer or user of the article, who

21

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT - 5
Case No. 2:17-cv-00223-RMP

1   obtains the article after the processing, will be regarded as the 'ultimate

2   purchaser.'"  *Id.* § 134.1(d)(2).[4]  In this manner, the plain text of the FMIA

3   (through incorporating the Tariff Act's requirements) mandates imported meat bear

4   country of origin labels all the way to the consumer, unless the meat undergoes a

5   "substantial transformation" after import.  *See id.* § 134.1(d).

6          Indeed, this is exactly how Congress explained the FMIA was meant to

7   operate.  When § 620(a) was proposed, House committee members introduced an

8   amendment to "require[] the labeling of all imported meat and meat products to the

9   point of ultimate consumer."  Attachment A (H.R. Rep. No. 90-653, at 69 (1967)).

10  The proponents wanted to ensure imported meat would not simply go to a domestic

11  meat "packer," who would be "considered by the Department of Agriculture as the

12  'ultimate consumer," and "no further labeling" of the meat's country of origin

13  would be required.  *Id.*  The proposed amendment was defeated, in part, because

14  the Executive told Congress that "[t]he Tariff Act of 1930, as amended, already

15  provides for the labeling of imported meats" along the lines Congress desired.  *Id.*

16  ───────────────

    [4] The Tariff Act provides a special definition of "ultimate purchaser" for goods

17  imported from North American Free Trade Agreement ("NAFTA") countries,

18  employing the language from the treaty, but the result is the same.  For NAFTA

19  goods, an item continues to be an import unless a domestic manufacturing process

20  substantially alters the item.  19 C.F.R. § 134.1(d).

21

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT - 6
Case No. 2:17-cv-00223-RMP

at 70.  It was with this understanding, that enforcing the Tariff Act would ensure Congress' desired labels, that it enacted the language in § 620(a) requiring imported meat comply with the marks and labels "for imported articles."

**B.    The FMIA's regulations fail to implement this requirement.**

Despite this background, USDA's FMIA regulations omit that imported meat must comply with the "mark[s] and label[s] [] required by such regulations for imported articles."  21 U.S.C. § 620(a).  Instead, implementing the exact rule that the FMIA's drafters feared, the regulations state:

> All products, after entry into the United States, shall be deemed and treated as domestic products and shall be subject to the applicable provisions of the Act and the regulations in this subchapter and the applicable requirements under the Federal Food, Drug and Cosmetic Act[.]

9 C.F.R. § 327.18(a).  The regulation does not require imported meat to comply with the "marks and labels for imports," as mandated by the FMIA.  To the contrary, the regulation reclassifies imported meat as a "domestic product[]" without any mention of the requirements of the Tariff Act or COOL.

As a result, according to USDA, products that undergo any "further processing or packaging" in the United States do not need to "retain[]" the labels that had been on "the original[ly] imported product[]."  Peter Chang, *Country of Origin Labeling: History and Public Choice Theory*, 64 Food & Drug L.J. 693, 699 (2009).  Only products that are sold in their exact "imported form," meaning

1  both in the physical state they were imported and the exact same container "need to

2  bear a marking" indicating their country of origin. *Id.*; *see also* Definition of

3  Terms—"Import (Imported)" and "Offer(ed) for Entry" and "Entry (Entered)," 54

4  Fed. Reg. 41045, 41045 (Oct. 5, 1989) (stating that under the FMIA, after a

5  product enters the United States it is "the regulatory equivalent of [a] domestic

6  product" and only "subject to the laws and regulations of the United States as

7  applied to domestic product[s]").

8         This is inconsistent with what the Tariff Act, and by extension the FMIA,

9  requires.  The language of the Tariff Act, that an item must undergo a "substantial

10  transformation" before a seller can remove the label identifying the item's country-

11  of-origin, means that simply repackaging an item does not enable a domestic

12  processor to take off the label.  *See* 19 C.F.R. § 134.1(d) (requiring a substantial

13  transformation, otherwise the consumer will be considered the ultimate purchaser).

14  The Tariff Act's regulations explain that a substantial transformation requires

15  changing the "name, character, or use" of an item so that the imported article turns

16  into a "different article." 19 C.F.R. § 134.35(a); *see also States v. Heon Seok Lee*,

17  No. 12-CR-109, 2017 WL 4283407, at *2 (N.D. Ill. Sept. 27, 2017) (a substantial

18  transformation requires "complex and meaningful" changes to the item); Alan S.

19  Gutterman, *Business Transactions Solutions* § 272:42 (West 2017) (a substantial

20  transformation requires "substantial further work or material added to an article").

21

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT - 8
Case No. 2:17-cv-00223-RMP

1    A "manufacturing or combining process" that "leaves the identity of the imported

2    article intact" is not a substantial transformation and "an appropriate marking must

3    appear on the imported article so that the consumer can know the country of

4    origin." *Uniroyal, Inc. v. United States*, 3 Ct. Int'l Trade 220, 224 (1982), *aff'd*,

5    702 F.2d 1022 (Fed. Cir. 1983) (affirming the lower court's substantial

6    transformation analysis).

7        In sum, USDA's implementation of the FMIA creates a significant gap

8    between the Tariff Act's labeling requirements, which USDA was statutorily

9    required to implement, and the agency's actual rules.  Under the Tariff Act, unless

10    a domestic entity takes imported meat and turns it into a new product with different

11    characteristics and uses, that meat still must bear a country-of-origin label at retail.

12    *See Ferrostaal Metals Corp. v. United States*, 11 Ct. Int'l Trade 470, 476–77

13    (1987) (explaining steel underwent a substantial transformation when the importer

14    altered its "chemical composition," and thereby "substantial[ly]" increased its

15    "value" and "commercial applications" so that it had a different "utility");

16    *Uniroyal,* 3 Ct. Int'l Trade at 224 (a substantial transformation does not include

17    adding a sole to a shoe, buttons to a shirt, or handles to luggage).  Yet, under

18    USDA's FMIA regulations, a domestic entity merely needs to unwrap and rewrap

19    an imported piece of meat in order to remove the Tariff Act's required label.

20    Mandatory Country of Origin Labeling of Beef, Lamb, Pork, Fish, Perishable

21

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT - 9
Case No. 2:17-cv-00223-RMP

Agricultural Commodities, and Peanuts, 68 Fed. Reg. at 61948 (under USDA's FMIA rules imported meat only needs to retain its country-of-origin label if it is sold in the same package in which it is imported).

**C.    The Government has repeatedly recognized USDA's FMIA regulations conflict with the statute.**

COOL has recently received substantial attention—including new legislation, regulations, and World Trade Organization ("WTO") litigation—which has forced both USDA and the Congressional Research Service to acknowledge the exact conflict between the FMIA and its regulations described above.

In 2002, Congress passed legislation expanding the country-of-origin labels required on imported food items, including mandating that items derived from imported livestock (*e.g.*, cattle and hogs), as well as imported meat (*e.g.*, beef and pork), be labeled with their country-of-origin.  Farm Security and Rural Investment Act of 2002, Pub. L. No. 107-171, § 282, 116 Stat. 134, 534 (2002).

In promulgating regulations under this new 2002 law, USDA recognized that the Tariff Act requires "most imported items, including food items … to be marked to indicate the 'country of origin' to the 'ultimate purchaser,'" who is "generally" "the last person in the United States who will receive the article in the form in which it was imported."  Mandatory Country of Origin Labeling of Beef, Lamb, Pork, Fish, Perishable Agricultural Commodities, and Peanuts, 68 Fed. Reg. at 61948.  The only circumstance in which a domestic "processor or manufacturer"

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT - 10
Case No. 2:17-cv-00223-RMP

1    will be "considered the 'ultimate purchaser'" is if the item undergoes a "substantial

2    transformation" before the domestic processor or manufacturer sells the item at

3    retail.  *Id.* at 61948-49.

4         Notwithstanding, the agency continued, under USDA's "policies and

5    directives" issued pursuant to the FMIA, "imported meat and meat products that

6    are further processed in the United States" in any manner "are not required to bear

7    country of origin declarations on the newly produced products."  *Id.* at 61949.

8    Instead, those products "are [] considered to be domestic."  *Id.*  Put another way,

9    under the FMIA regulations, country-of-origin labels on imports are only

10   "conveyed" to consumers if the meat is imported in "consumer-ready packaging"

11   and thus does not undergo even the most minor changes before sale.  *Id.* at 61948.

12        Yet, rather than correct its FMIA regulations so they would comply with the

13   Tariff Act, USDA simply issued new regulations pursuant to the 2002 law.  Under

14   its new COOL rules, all "covered commodities," including beef and pork products,

15   were required to "retain their origin … through retail sale."  *Id.* at 61949.  In other

16   words, the new COOL rules superseded the faulty FMIA regulation and required

17   COOL on all meat products at retail, whether they came from imported meat or

18   livestock.

19        But, Canada and Mexico, acting on behalf of entities that sell cattle and hogs

20   in the United States, challenged the new COOL rules before the WTO.  They

21

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT - 11
Case No. 2:17-cv-00223-RMP

1    argued that the new rules were inconsistent with NAFTA because they discouraged

2    importing *live* cattle and hogs.  Canada and Mexico did *not* challenge the labeling

3    of imported meat (beef and pork).

4        Nonetheless, the WTO panel reviewed the Tariff Act's labeling

5    requirements for imported meat and concluded there were "notable differences"

6    between what the Tariff Act required and the United States' new COOL rules.

7    Attachment B (Panel Report, *United States – Certain Country of Origin Labeling*

8    *(COOL) Requirements*, ¶ 7.698, WTO Doc. WT/DS384/RW (adopted Oct. 20,

9    2014) (quotation marks omitted)).  The panel found it particularly significant that

10   the new COOL rules, but not the Tariff Act, covered products derived from

11   imported livestock.  *Id.*  As a result, the panel went on, the Tariff Act's

12   requirements, unlike the new COOL rules, appeared "equivalent" to what was

13   allowed under NAFTA.  *Id.* ¶ 7.700.

14       In response to the suit, WTO ordered sanctions if the United States

15   continued to impose its COOL requirements on products derived from imported

16   Canadian and Mexican cattle and hogs (livestock), and Congress repealed the 2002

17   COOL law to the extent it covered beef and pork products.  In doing so, Congress

18   made *no* changes to the FMIA or the Tariff Act.  Consolidated Appropriations Act,

19   2016, Pub. L. No. 114-113, § 759, 129 Stat. 2242, 2284-85 (2016).

20

21

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT - 12
Case No. 2:17-cv-00223-RMP

Yet, in response, USDA revised its new COOL regulations so they did not cover beef and pork products, without correcting the tension it had acknowledged between the FMIA regulations and the statute.  Removal of Mandatory Country of Origin Labeling Requirements for Beef and Pork Muscle Cuts, Ground Beef, and Ground Pork, 81 Fed. Reg. 10755 (Mar. 2, 2016).  That is, for imported beef and pork, USDA reverted back to enforcing the FMIA regulations the agency had acknowledged were inconsistent with the authorizing law (as the regulations do not require the labels mandated by the Tariff Act).

In response, the Congressional Research Service issued a report stating that, once again, there is "a potential for conflict" between the statutory labeling requirements for imported beef and pork and USDA's regulations.  Greene, *supra*, at 31.  The Congressional Research Service explained, Congress directed that "[m]eat and poultry imports must comply not only with the" FMIA "but also with Tariff Act labeling regulations."  *Id*.  However, the Tariff Act "generally requires that imports undergo more extensive changes (i.e., 'substantial transformation') than required by USDA to avoid the need for labeling."  *Id*.  In fact, despite the Tariff Act's requirements, USDA's current regulations provide that "even minimal processing, such as cutting a larger piece of meat into smaller pieces" means the imported beef and pork "no longer requires [country-of-origin] labeling on either the new product or its container."  *Id*.

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT - 13
Case No. 2:17-cv-00223-RMP

In sum, although USDA briefly corrected the unlawful rule Plaintiffs challenge, the agency has returned to implementing FMIA regulations that allow imported beef and pork to dodge the Tariff Act's requirements, even though the agency and the Congressional Research Service recognize that this is inconsistent with the authorizing statute. Nothing in the WTO's decision or the new COOL legislation, regulations or revocations changed the FMIA's requirements. To the contrary, these events, and the Government's own commentary on them, highlight that USDA can and should mandate COOL on imported beef and pork until it undergoes a substantial transformation, as the FMIA and Tariff Act demand.

**D.    USDA's failure to implement the FMIA harms Plaintiffs.**

USDA's own data demonstrates that its failure to effectuate the FMIA and, correspondingly, the Tariff Act is no mere unlawful rule, but affirmatively undermines the market for domestic cattle producers. For example, a large amount of beef is imported to the United States as "primal or subprimals": beef already cut into the chuck, rib, loin, round, or thin cuts; or even further broken down so that, for instance, the primal rib is separated into the short rib and ribeye roll that consumers purchase. In just the first *week* of October 2017 more than 4,600 metric tons of beef was imported to the United States in these forms. USDA's public records indicate that over the course of 2016 more than 208,300 metric tons of beef

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT - 14
Case No. 2:17-cv-00223-RMP

1   was imported in this way.  Dkt. No. 1, ¶¶ 101-02.[5]  That equates to more than

2   10,000,000 pounds of beef in a week and more than 459,000,000 pounds of beef in

3   a year that was imported in the form in which it would be sold, or where it would

4   only need to be sliced before it could be marketed.  However, under USDA's

5   current regulations, so long as an importer or domestic processor makes any

6   changes to the product or packaging, it can sell that imported short rib in the form

7   it was imported, after removing the country-of-origin label and adding a "Product

8   of U.S.A." sticker.  *See* Chang, *supra*, at 699.

9        Unsurprisingly, this diminishes Plaintiffs' members' income.  Plaintiffs the

10  Ranchers-Cattlemen Action Legal Fund, United Stockgrowers of America ("R-

11  CALF") and Cattle Producers of Washington ("CPoW") are organizations

12  exclusively made up of domestic cattle producers.  Declaration of William Bullard

13  ("Bullard Decl.") ¶ 3; Declaration of Richard Nielsen ("Nielsen Decl.") ¶ 3.

14  Consistent with the studies reflecting high consumer demand for domestically

15  produced meat, R-CALF's and CPoW's members receive increased compensation

16  for their cattle when consumers recognize they are fully produced in the United

17  [5] *See* USDA, Livestock, Poultry, and Grain International Reports (Nov. 2, 2017),

18  https://www.ams.usda.gov/market-news/livestock-poultry-and-grain-international-

19  reports (providing a variety of USDA reports from which Plaintiffs have calculated

20  the above figures).

21

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT - 15
Case No. 2:17-cv-00223-RMP

States. *See, e.g.,* Umberger, *supra,* at 110 ("Sixty-nine percent of the participants bid more for, and were willing to pay a premium for the steak labeled as 'U.S.A. Guaranteed.'"); Nielsen Decl. ¶ 6; Bonds Decl. ¶ 5; Niemi Decl. ¶ 5; Declaration of Jeffrey Schmidt ("Schmidt Decl.") ¶ 5. Indeed, the increased revenue domestic cattle producers receive when they are able to differentiate their products from imported beef is so significant that CPoW helped build an independent slaughterhouse in eastern Washington so its members can sell direct to consumers, promoting their meat as a true, domestic product. Nielsen Decl. ¶ 6.

Accordingly, when USDA enforced COOL on beef products, R-CALF's and CPoW's members received significantly higher prices for the cattle they sold to the meat packing companies. Bonds Decl. ¶ 6; Niemi Decl. ¶ 6; Schmidt Decl. ¶ 6. Because the companies could no longer pass off imported meat as domestic, they had to compensate domestic producers at a premium rate for their premium product. Bullard Decl. ¶ 7; Nielsen Decl. ¶ 7.

Correspondingly, when Congress revoked its 2002 COOL requirements and USDA reverted to its FMIA rule allowing imported beef and pork to be reclassified as a domestic product, free from COOL, R-CALF's and CPoW's members' income dropped. Bullard Decl. ¶ 8; Nielsen Decl. ¶ 8; Bonds Decl. ¶ 7; Niemi Decl. ¶ 7; Schmidt Decl. ¶ 7. They have been told by the multinational meat packers that if COOL returned the packers would again pay a premium for

1    domestic cattle and beef.  Bonds Decl. ¶ 8; Niemi Decl. ¶ 8.  But, without any form

2    of COOL—and a USDA policy that imports can be called "Products of U.S.A."—

3    currently every import decreases consumer demand for Plaintiffs' members' true

4    domestic products, and enables packers to pay domestic producers a lower rate.

5    *See*, *e.g.*, Bonds Decl. ¶¶ 7, 9-10; Niemi Decl. ¶¶ 7, 9-10.

6    ### III.  STANDARD OF REVIEW

7            In response to Plaintiffs' Complaint, Defendants conceded there is no

8    dispute of fact.  *See* Dkt. No. 9, at 2.  Consistent with this, Defendants' Answer

9    does not cite to any additional statutes, regulations, records, or documents that can

10   impact this litigation, repeatedly stating the Court should look to Plaintiffs'

11   authority for "a full and accurate statement of its content."  Dkt. No. 10.

12   Therefore, this case can be resolved on summary judgment without discovery.  *See*,

13   *e.g.*, *Long Beach Area Chamber of Commerce v. City of Long Beach*, 603 F.3d

14   684, 689 (9th Cir. 2010).

15   ### IV.  STANDING

16           While, as noted above, Defendants indicate they do not contest the issue,

17   Dkt. No. 9, at 2; Dkt. No. 10, at 28 (stating Defendants' only defense is that

18   Plaintiffs fail to state a claim), so that the record is complete for immediate

19   summary judgment on the merits, Plaintiffs detail below how they have standing to

20

21

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT - 17
Case No. 2:17-cv-00223-RMP

1    bring this action on two bases: (a) the standing of their members; and (b) in their

2    own right.

3         An association has standing to sue on behalf of its members when "'(a) its

4    members would otherwise have standing;'" (b) "'the interests it seeks to protect are

5    germane to the organization's purpose;'" and (c) the claim does not require "'the

6    participation of individual members in the lawsuit.'"  *Or. Advocacy Ctr. v. Mink*,

7    322 F.3d 1101, 1109 (9th Cir. 2003) (quoting *Hunt v. Wash. State Apple Adver.*

8    *Comm'n*, 432 U.S. 333, 343 (1977)).  A suit like this, seeking equitable relief to

9    prevent Defendant from disregarding Congress' directive, does not require the

10   participation of an association's members.  Thus, only the first two requirements

11   need be satisfied.  *See Coho Salmon v. Pac. Lumber Co.*, 30 F. Supp. 2d 1231,

12   1241 (N.D. Cal. 1998).  However, under the APA, Plaintiffs must show that "[i]n

13   addition to Article III standing" their members' "asserted interests [] fall within the

14   'zone of interests' protected by the statute[.]"  *City of Spokane v. Monsanto Co.*,

15   237 F. Supp. 3d 1086, 1092 (E.D. Wash. 2017).

16        "[A]n organization has 'direct standing to sue [when] it show[s] a drain on

17   its resources from both a diversion of its resources and frustration of its mission,'"

18   in response to the alleged unlawful act.  *Valle del Sol Inc. v. Whiting*, 732 F.3d

19   1006, 1018 (9th Cir. 2013) (additions in original) (quoting *Fair Hous. Council of*

20

21

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT - 18
Case No. 2:17-cv-00223-RMP

1    *San Fernando Valley v. Roommate.com*, LLC, 666 F.3d 1216, 1219 (9th

2    Cir.2012)).

3         R-CALF's and CPoW's members have Article III standing because they

4    have demonstrated that they are harmed by USDA's decision to controvert

5    Congress and allow all imported beef processed at domestic facilities to be

6    marketed without country-of-origin labels.  Consumers pay more for R-CALF's

7    and CPoW's members' meat when they are able to identify it as having been born,

8    raised, and slaughtered domestically.  *See*, *e.g.*, Umberger, *supra,* at 110; Bullard

9    Decl. ¶ 7; Nielsen Decl. ¶ 6; Bonds Decl. ¶ 5; Niemi Decl. ¶ 5; Schmidt Decl. ¶ 5.

10   However, because, under USDA's rules, multinational beef packers' foreign and

11   domestic products can be labeled so as to appear indistinguishable, the companies

12   only compensate producers at the rate for the lowest common denominator of

13   meat—what they pay for a foreign product.  Bullard Decl. ¶¶ 7-8; Nielsen Dec.

14   ¶ 7-8; Bonds ¶¶ 6-8; Niemi Decl. ¶¶ 6-8; Schmidt Decl. ¶¶ 6-7.  Packers'

15   improperly labeled meat also reduces consumer demand for true domestic

16   products.  *See*, *e.g.*, Bullard Decl. ¶ 7; Nielsen Decl. ¶ 7; Bonds Decl. ¶ 6-7; Niemi

17   Decl. ¶¶ 6-7; Schmidt Decl. ¶¶ 6-7.  When USDA required COOL, and the

18   packers had to distinguish between foreign and domestic products, Plaintiffs'

19   members received substantially higher prices from the packers.  Bonds Decl. ¶¶ 6-

20   7; Niemi Decl. ¶¶ 6-7; Schmidt Decl. ¶¶ 6-7.  Plaintiffs have been told those prices

21

1    will only return if COOL is reinstated.  Bonds Decl. ¶ 8; Niemi Decl. ¶ 8.  Put

2    simply, Plaintiffs are suffering financial injuries because USDA allows imported

3    meat to avoid the Tariff Act's COOL requirements.

4        These injuries clearly fall within the zone of interest to be protected by the

5    FMIA, as the statute itself explains.  The congressional findings supporting the

6    FMIA state that "mislabeled …. articles can be sold at lower prices and compete

7    unfairly."  21 U.S.C. § 602.  Through the FMIA's labeling requirements, Congress

8    was specifically seeking to prevent the exact harm Plaintiffs are suffering and

9    attempting to correct through this suit.

10       Finally, protecting their members' ability to receive a premium for their

11   domestically raised cattle and beef is not only germane to R-CALF's and CPoW's

12   missions, but the organizations have increased their activities on this issue in

13   response to USDA's failure to follow the law, providing the organizations standing

14   in their own right, as well as based on their members.  R-CALF's and CPoW's

15   objective is to advocate for domestic producers.  Bullard Decl. ¶ 5; Nielsen Decl.

16   ¶ 4.  With USDA's refusal to enforce any form of COOL on beef, R-CALF and

17   CPoW have diverted their human and financial resources to develop grassroots

18   support and advocate for COOL.  Bullard Decl. ¶¶ 5, 8-11; Nielsen Decl. ¶¶ 4, 8-

19   11.  For instance, R-CALF has diverted resources to urge USDA to restore COOL,

20   and work with state legislatures in Colorado, Wyoming, and South Dakota to

21

develop state COOL requirements.  Bullard Decl. ¶¶ 8-10.  CPoW has altered its

activities to work with the Stevens and Spokane County Cattlemen's Associations

to promote COOL.  Nielsen Decl. ¶¶ 8-10.  If USDA enforced any form of COOL

for beef products, the organizations would divert less of their energies to the

matter, and they could address other pressing concerns, thereby more fully

protecting domestic ranchers.  Bullard Decl. ¶ 11; Nielsen Decl. ¶ 11.  As a result,

representing their members' interest in this litigation is not only appropriate, but

necessary, because R-CALF's and CPoW's missions have been frustrated by

USDA's unlawful action.  *Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1341-42

(11th Cir. 2014) (organizations dedicated to "safeguarding voter rights" "diverted

resources," establishing organizational standing when they "expended resources to

locate and assist [] members to ensure [] they were able to vote").

Ensuring that all of the labeling requirements for imported beef are enforced

is central to domestic ranchers' livelihoods and thus R-CALF's and CPoW's

function.  As a result, they and their members have standing to challenge USDA's

decision to ignore the law.

## V.  SUMMARY OF ARGUMENT

USDA's failure to implement the FMIA's requirement that imported beef

and pork be marked and labeled as required by the Tariff Act violates hornbook

law, entitling Plaintiffs to summary judgment.  An agency cannot undo "legislative

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT - 21
Case No. 2:17-cv-00223-RMP

judgments." *Orca Bay Seafoods v. Nw. Truck Sales, Inc.*, 32 F.3d 433, 437 (9th Cir. 1994). Thus, USDA's decision to omit from its FMIA regulations the statute's demand that imported meat be "marked and labeled as required by such regulations for imported articles," 21 U.S.C. § 620(a), is unlawful.

In these circumstances, the Administrative Procedure Act directs the Court to "hold unlawful and set aside" the agency action. 5 U.S.C. § 706(2). Here, given USDA's demonstrated unwillingness to follow the law, this Court should not only declare unlawful and vacate USDA's rule, but also issue an injunction mandating that USDA enforce compliance with the FMIA and its labeling requirements.

## VI.  ARGUMENT

**A.    USDA's FMIA regulation regarding the labeling of imports violates Congress' clear intent and thus is unlawful.**

"[I]n reviewing agency statutory interpretations, '[f]irst, always, is the question whether Congress has directly spoken to the precise question at issue. If [as here] the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.'" *Pac. Mar. Ass'n v. Nat'l Labor Relations Bd.*, 827 F.3d 1203, 1209 (9th Cir. 2016) (second brackets in original) (quoting *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842-43(1984)). To determine whether Congress made its intent clear, courts "'employ[] traditional tools of statutory construction,'" including examining the legislative history. *Bicycle Trails Council*

*of Marin v. Babbitt*, 82 F.3d 1445, 1452-53 (9th Cir. 1996) (quoting *Chevron*, 467 U.S. at 843 n. 9).

In this case, one does not need to move beyond the language of the FMIA to determine that USDA's FMIA regulation regarding imported meat is inconsistent with Congress' intent. The statute states that imported meat may "be deemed and treated as domestic articles subject to the" FMIA, Food Drug and Cosmetic Act, and *"Provided," i.e.*, so long as, the meat is also "marked and labeled as required by such regulations for imported articles." 21 U.S.C. § 620(a) (emphasis in original).

USDA's regulation excises the last clause. It states that all imports "shall be deemed and treated as domestic products" if they simply comply with the FMIA and Food, Drug and Cosmetic Act. 9 C.F.R. § 327.18(a). The regulation allows imports to receive the benefit of being "treated as domestic products," without imposing the full set of conditions Congress established are necessary.

There can be no dispute that Congress' objective in § 620(a) was to condition the sale of imported meat on the meat complying with the marks and labels required for imported goods. As the D.C. Circuit has explained, § 620(a) "is exclusively prohibitory in nature." *Ganadera Indus., S.A. v. Block*, 727 F.2d 1156, 1160 (D.C. Cir. 1984). Section 620(a) establishes mandates that must be met. Consistent with this, the language § 620(a) uses to describe what is required

1    regarding the marking and labeling of "imported articles" is obligatory:  The

2    privileges the FMIA grants to imported meat are "provided," *i.e.*, based on, the

3    items having the marks and labels mandated of imports.

4         This is how similar language has been understood in other statutes.  The

5    Eighth Circuit has explained that when Congress states something is "provided"

6    due to something else, that is a "direct[ive]."  *Beef Nebraska, Inc. v. United States*,

7    807 F.2d 712, 717 (8th Cir. 1986); *see also S.E.C. v. Sprecher*, 594 F.2d 317, 319-

8    20 (2d Cir. 1979) (declaring an activity must be "provided by statute" is the

9    equivalent of saying rules in the statute must be "met").  Thus, the FMIA's

10   language directs imports comply with the referenced labeling rules, such as the

11   Tariff Act.

12        Were there any doubt in this plain text reading of the FMIA, Congress

13   removed it through its express articulation of its intent.  The House committee

14   reviewing the FMIA explained its members were concerned that imported meat

15   could be unloaded in the United States, taken to a domestic facility, and then "no

16   further labeling of any imported meat" would be required.  Attachment A (H.R.

17   Rep. No. 90-653, at 69).  This concern was allayed because the committee was

18   assured the "Tariff Act of 1930, as amended, already provide[d] for the labeling of

19   imported meats" so that importers could not dupe consumers through rebranding

20   foreign meat as domestic.  *Id.* at 70.  It was on this basis that the committee passed

21

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT - 24
Case No. 2:17-cv-00223-RMP

1  the FMIA's requirement that imported meat must comply with the "mark[s] and

2  label[s] … for imported articles."  This course of events makes clear Congress

3  understood and intended the FMIA's text to require imported meat be labeled as

4  provided for in the Tariff Act.

5      If that were not enough, the Government has confirmed Plaintiffs' exact

6  reading of the laws and agreed that the agency has created a "conflict" between the

7  statute and rules.  Greene, *supra*, at 31 (Congressional Research Service report).

8  USDA itself acknowledged that the Tariff Act requires imported meat bear

9  "mark[s] [] indicat[ing] the 'country of origin'" all the way to the consumer, as

10  long as the meat remains in its imported "form."  Mandatory Country of Origin

11  Labeling of Beef, Lamb, Pork, Fish, Perishable Agricultural Commodities, and

12  Peanuts, 68 Fed. Reg. at 61948; *see also* 19 C.F.R. § 134.1(d).  Yet, USDA allows

13  domestic meat processors to remove those labels if they conduct even minimal

14  processing or repackage an item.  Mandatory Country of Origin Labeling of Beef,

15  Lamb, Pork, Fish, Perishable Agricultural Commodities, and Peanuts, 68 Fed. Reg.

16  at 61949; Greene, *supra*, at 31; Chang, *supra*, at 699.

17      Congress could not have been clearer in its objectives with the FMIA:  To

18  require the FMIA to enforce the labeling rules for imported meat, including those

19  in the Tariff Act.  USDA admits, and the Congressional Research Service confirms

20  that the agency has chosen to subvert those statements.  Any single one of these

21

facts would be sufficient to hold that the regulation cannot stand. *Pac. Mar. Ass'n.*, 827 F.3d at 1209. It certainly should not be allowed to persist.

**B.    Accordingly, USDA's regulation should be vacated and declared unlawful, and the agency should be enjoined.**

In light of the facts above, the standard remedy would be to declare unlawful and vacate USDA's regulation. "Typically," once the court determines an agency action is unlawful, it should "vacate the agency's action and remand to the agency to act in compliance with its statutory obligations." *Defs. of Wildlife v. U.S. Envtl. Prot. Agency*, 420 F.3d 946, 978 (9th Cir. 2005), *rev'd on other grounds Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644 (2007). Therefore, this Court should hold 9 C.F.R. § 327.18(a) invalid because it is inconsistent with FMIA under which it is promulgated, and vacate that regulation so USDA cannot continue to treat imported beef and pork as "domestic products," unless that meat also complies with the marks and labels required for imported goods.

The Ninth Circuit has stated that "[i]n rare circumstances, when we deem it advisable," an "agency action [can] remain in force until the action can be reconsidered or replaced." *Humane Soc. of U.S. v. Locke*, 626 F.3d 1040, 1053 n.7 (9th Cir. 2010). This is not such an unusual case. To allow USDA's rule to stand when it directly conflicts with the statute under which it was promulgated would be "a novel equitable determination" that "seems to run roughshod over Congress[]." *Defs. of Wildlife v. Salazar*, 776 F. Supp. 2d 1178, 1187 (D. Mont. 2011); *see also*

*Pollinator Stewardship Council v. U.S. E.P.A.*, 806 F.3d 520, 532 (9th Cir. 2015) (indicating vacatur is necessary where there are "fundamental flaws" that would "prevent[]" the agency "promulgating the same rule on remand (quotation marks omitted)).

Indeed, USDA's regulation should not only be vacated, but the agency should also be enjoined from allowing imported meat to be considered in compliance with the FMIA, unless the meat also bears all the marks and labels required of imports. That is, USDA should be required to treat imported meat as violating the FMIA (prohibiting its sale) unless the meat is marked as required by the Tariff Act. *See*, *e.g.*, *Citizens for Better Forestry v. U.S. Dep't of Agric.*, No. C 04-4512 PJH, 2007 WL 1970096, at *19 (N.D. Cal. July 3, 2007) (confirming nationwide injunction preventing USDA from implementing unlawful policies).

"'[A] permanent injunction against future violations of a statute is permitted because such [relief] merely requires the enjoined party to obey the law.'" *United States v. Dental Care Assocs. of Spokane Valley,* No. 2:15-CV-23-RMP, 2016 WL 755638, at *4 (E.D. Wash. Feb. 25, 2016) (Peterson, J.) (quoting U*nited States v. Campbell*, 897 F.2d 1317, 1324 (5th Cir. 1990)). Yet, even if the Court were to apply the formal test for permanent injunctions, it is easily satisfied in this case. As this Court has explained, under that test, once plaintiffs have shown defendants are engaged in unlawful conduct injuring plaintiffs, plaintiffs must further establish

1  that their injury is irreparable through monetary damages, the balance of the

2  hardships justify the relief, and the public interest would not be disserved by the

3  relief.  *Id.*  Here, all three factors strongly support an injunction for the exact same

4  reason:  Congress explained that the FMIA's marking and labeling requirements

5  are necessary to protect consumers and producers.

6      Congress demanded that meat bear the marks and labels required by the

7  FMIA because it determined they are "essential in the public interest."  21 U.S.C.

8  § 602.  It further stated that the failure to follow the FMIA's rules is "injurious to

9  the public welfare, [and it] destroy[s] markets for wholesome, not adulterated, and

10  properly labeled and packaged meat and meat food products."  *Id.* § 602.

11      Where Congress articulates a rule, there is a presumption that the failure to

12  enforce it will produce harm to the covered individuals, and that the public interest

13  favors enforcing the policy.  *See Apple Computer, Inc. v. Franklin Computer*

14  *Corp.*, 714 F.2d 1240, 1254-55 (3d Cir. 1983).  This principle is doubly correct

15  when Congress expressly states that the rule is needed to protect Plaintiffs and the

16  public.  Although, often, economic injuries do not constitute irreparable harms

17  because they "could be remedied by money damages," this not true here because

18  damages are unavailable due to "sovereign immunity."  *California Hosp. Ass'n v.*

19  *Maxwell-Jolly*, No. CIV S-10-3465, 2011 WL 285866, at *2 (E.D. Cal. Jan. 28,

20

21

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT - 28
Case No. 2:17-cv-00223-RMP

2011).  Therefore, injunctive relief is the only way to protect Plaintiffs from harm. *Id.*

Similarly, the balance of the hardships must favor complying with the law as written.  *Apple Computer, Inc.*, 714 F.2d at 1255; *Dental Care Assocs. of Spokane Valley*, 2016 WL 755638, at *5.  This is especially true in this case because the rule Plaintiffs are asking USDA to enforce is one meat already must comply with when it is imported.  *See* 9 C.F.R. § 327.14(a) (requiring meat to bear country-of-origin labels when it is "offered for importation," just not after it undergoes any processing in this country).  Plaintiffs are merely seeking to have meat packers carry forward the country-of-origin labels that are already on goods when they arrive so that information is passed along to consumers, rather than ripped off the products.

Particularly given USDA's unwillingness to enforce the FMIA—even in the face of its own and the Congressional Research Services' statements that its regulations conflict with the law—in addition to vacating the regulation, this Court should issue an injunction to order USDA to fully effectuate the FMIA.

## VII.  CONCLUSION

For the foregoing reasons, Plaintiffs request this Court: (a) grant Plaintiffs summary judgment; (b) declare USDA's failure to require the country-of-origin labels mandated by the Tariff Act unlawful; (c) vacate 9 C.F.R. § 327.18(a); and

(d) enjoin USDA be from deeming imported beef and pork in compliance with the

FMIA unless it bears the labels required by the Tariff Act.

RESPECTFULLY SUBMITTED AND DATED this 3rd day of November,

2017.

TERRELL MARSHALL LAW GROUP PLLC

By:   /s/ Beth E. Terrell, WSBA #26759
        Beth E. Terrell, WSBA #26759
        Blythe H. Chandler, WSBA #43387
        Attorneys for Plaintiffs
        936 North 34th Street, Suite 300
        Seattle, Washington 98103-8869
        Telephone: (206) 816-6603
        Facsimile: (206) 319-5450
        Email:  bterrell@terrellmarshall.com
        Email:  bchandler@terrellmarshall.com

        David S. Muraskin, *Admitted Pro Hac Vice*
        Attorney for Plaintiffs
        PUBLIC JUSTICE, P.C.
        1620 L Street NW, Suite 630
        Washington, DC 20036
        Telephone: (202) 861-5245
        Email:  dmuraskin@publicjustice.net

        J. Dudley Butler, *Admitted Pro Hac Vice*
        BUTLER FARM & RANCH LAW
        GROUP, PLLC
        499-A Breakwater Dr.
        Benton, MS 39039
        Telephone:  (662) 673-0091
        Email:  jdb@farmandranchlaw.com

1

## CERTIFICATE OF SERVICE

2          I, Beth E. Terrell, hereby certify that on November 3, 2017, I electronically

3   filed the foregoing with the Clerk of the Court using the CM/ECF system which

4   will send notification of such filing to the following:

5                  Chad A. Readler, Acting Assistant Attorney General
                   Joseph H. Harrington,
6                  Acting United States Attorney Eastern District of Washington
                   Eric R. Womack, Assistant Branch Director
7                  Tamra T. Moore, Trial Attorney
                   Attorneys for United States Department of
8                  Agriculture ("USDA"), and Sonny Perdue
                   UNITED STATES DEPARTMENT OF JUSTICE
9                  CIVIL DIVISION — FEDERAL PROGRAMS BRANCH
                   20 Massachusetts Avenue, N.W.
10                 Washington, DC 20530
                   Telephone: (202) 305-8628
11                 Facsimile: (202) 305-8517
                   E-mail: Tamra.Moore@usdoj.gov
12

13          DATED this 3rd day of November, 2017.

14                         TERRELL MARSHALL LAW GROUP PLLC

15                         By:    /s/ Beth E. Terrell, WSBA #26759
                                  Beth E. Terrell, WSBA #26759
16                                Attorneys for Plaintiff and the Class
                                  936 North 34th Street, Suite 300
17                                Seattle, Washington 98103
                                  Telephone: (206) 816-6603
18                                Facsimile: (206) 319-5450
                                  Email:  bterrell@terrellmarshall.com
19

20

21

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT - 31
Case No. 2:17-cv-00223-RMP